UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-62216-CIV-MARRA

LIVING COLOR ENTERPRISES, INC., a
Florida corporation,

Plaintiff,

vs.

NEW ERA AQUACULTURE, LTD., a
United Kingdom Private limited company et al.,

Defendants.
_____/

**OPINION AND ORDER**

     This cause is before the Court upon Defendants Aqua-Tech Co.'s Motion for Summary

Judgment (DE 219); Daniel Leyden's Motion for Summary Judgment (DE 224) ("Defendants,"

collectively) and Plaintiff Living Color Enterprises Inc.'s Motion for Summary Judgment (DE

223). The Court has carefully considered the Motions and is otherwise fully advised in the

premises.

     I. Background

     The facts, as culled from affidavits, exhibits, depositions, answers, answers to

interrogatories, for the purpose of this motion, are as follows:

     Plaintiff Living Color Enterprises, Inc. ("Living Color") is in the business of providing

products and services related to all aspects of facilitating the enjoyment of marine life.

(Defendant's Resp. to Pl. ¶ 1, DE 234.) As of August 2009, Defendant New Era Aquaculture,

Ltd. ("New Era") was a British private limited company that developed a unique process for

manufacturing high quality and nutritious marine animal food. (Pl. Am. Statement of Facts ¶ 1,

DE 236.)  On August 10, 2009, New Era entered into an agreement with Living Color to be the exclusive distributor of New Era's marine animal foods in North America for two years effective August 1, 2009. (Aug. 10, 2009 email from Peter Kersh to Matt Roy, DE 33-1.)

In 2011, Living Color hired Defendant John O'Rourke ("O'Rourke"), who was subsequently promoted to lead operations for New Era branded marine animal food business. (Defendant's Resp. to Statement ¶ 14.)  O'Rourke signed a non-compete agreement as a condition of his employment with Living Color, knowing the information outlined in the non-compete agreement was confidential.  The agreement prohibited O'Rourke from disclosing any trade secrets or information relating to customers or encouraging or enticing any customer, client, vendor or supplier to cease doing business with Living Color.  (Defendant's Resp. to Statement ¶ 15; Ex. 3, DE 222-4. )   On or about March 27, 2013, Living Color hired Defendant Daniel Leyden ("Leyden") to be its northeast sales representative for New Era products.  Leyden was responsible for growing the sales of the New Era brand products in the northeastern United States and was placed in a position of trust.  (Pl. Am. Statement ¶ 23; Leyden Dep. 99.)  O'Rourke and Leyden were primary and secondary personnel, respectively, and responsible for developing and managing Living Color's marine animal food business in the eastern part of the United States. (Todd Ashford Decl. ¶ ¶ 10, 12, DE 222-1.)  By 2014, no one in the United States knew the New Era product better than O'Rouke, and Leyden was the go-to person for New Era products in the northeast, with 95% of his work at Living Color being devoted to the sale of New Era branded products. (Def. Resp. to Statement ¶ 19.)

Defendant Aqua Tech Co. ("Aqua-Tech") competes with Living Color in the market for marine animal food products and also offers aquarium foods. (Def. Resp. to Statement ¶ 20.)

<u>Facts related to the Trademark</u>

On August 7, 2009, New Era filed an application with the United States Patent and Trademark Office ("USPTO") for registration of its Word Mark "New Era Aquaculture" for trademark protection in the United States. (Pl. Am. Statement ¶ 2.)   Living Color contends that New Era expressed to it that it had no intent to use, promote or build goodwill in the mark in United States and had no objection to Living Color using the mark in the United States. (Ashford Decl. ¶ 6.) No formal agreement existed concerning the use of the mark. (Def. Resp. to Statement ¶ 6.)  Living Color invested significantly in the New Era food product and building its reputation in the United States. (Def. Resp. to Statement ¶ 8.)  Living Color coordinated regulatory approvals, developed FDA-compliant labeling, built a temperature-controlled facility, developed a business plan, marketed New Era products and developed a pool of customers. (Def. Resp. to Statement ¶ 9.)  Goodwill developed in Living Color's marine animal business. (Ashford Decl. ¶ 9.)  Living Color made decisions on how to advertise or market the New Era product. (O'Rourke Dep. 59, DE 222-4.)  However, a lot of customers just saw it as New Era fish food, not Living Color fish food. (O'Rourke Dep. 61.)  New Era marine product brochures were delivered to users and customers in the United States. (O'Rourke Dec. ¶ 11.)

There was never any written agreement between New Era and Living Color regarding United States trademark rights for the New Era marine animal food products manufactured by New Era. (Pl. Am. Statement ¶ 4.)  There are no written communications or discussions regarding trademark rights between New Era and Living Color.  (Todd Ashford Dep. at 82-83, DE 215-1.)  While there was no specific written language that Living Color claimed ownership of the New Era mark, the business relationship between New Era and Living Color allowed

3

Living Color full access to develop and market the New Era product and mark. (Todd Ashford Dep. 80-81, DE 215-1.) New Era and Living Color did not have any non-disclosure or confidentiality agreement in connection with their business relationship. (Pl. Am. Statement ¶ 6.) New Era manufactured all the products in England and shipped bulk containers to Living Color for distribution in the United States. Living Color never produced the product. (Pl. Am. Statement ¶ 7.)

According to Living Color, it designed the labels for the New Era product and repackaged the product into smaller containers. (Rodney Robinson Dep. 88, DE 222-3.) According to Aquatech, New Era created and invented the New Era logo that was present on all the labeling of the New Era brand marine animal food products sold by Living Color. (O'Rourke Aff. ¶ 7, DE 215-5; Label, DE 215-7.)

On July 13, 2010, the USPTO issued its registration of the New Era trademark in the United States. (Pl. Am. Statement ¶ 9.) Living Color management never made any attempt to determine if the New Era trademark had been registered in the United States. (Pl. Am. Statement ¶ 10.) On May 21, 2012, New Era applied for a second trademark registration with the USPTO for its word mark "New Era" with a crescent design. (Pl. Am. Statement ¶ 14.) Living Color did not know that New Era had applied for its second trademark registration in the United States. (Pl. Am. Statement ¶ 15.) On March 26, 2013, the USTPO issued its registration for the second New Era trademark in the United States for the word mark "New Era" with a crescent. (Pl. Am. Statement ¶ 22.) Those registrations were since cancelled in 2015. (Notice of Judgment Cancelling Registration, DE 138.)

The New Era brand marine animal food product brochures, Fish Food and Feeding Guide,

4

was produced by New Era and delivered to Living Color and users and customers in the United States.  (O'Rourke Aff. ¶ 11.)  The guide identified the New Era marks as registered trademarks with the "®" symbol.  (LCEI-008931, DE 215-6.)  The address on the guide is that for New Era in the United Kingdom. (LCEI-008930, DE 215-6.)

Public aquarium customers did not recognize a connection between Living Color (distributor) and New Era (manufacturer) and only recognized the product as New Era fish food. (O'Rourke Dep. 61.)  O'Rourke testified that a customer associated him and Living Color with the New Era brand. (O'Rourke Dep. 192.)

<u>Facts relating to the transition from Living Color to Aqua Tech</u>

On September 21, 2012, Living Color had a telephone conference with the owners of New Era.  New Era advised Living Color that the exclusive business relationship "expired over a year ago" and New Era "would certainly entertain entering into another exclusive agreement." As "expected," New Era indicated that the "brand" was trademarked and Living Color could not use it in their company name. (Sept. 21, 2012 email from Rodney Robinson to Dana Parham, DE 215-1.)  At that time, New Era and Living Color had a "handshake agreement."  (Aqua Tech Dep. 41.)  Living Color saw itself as the face of New Era in the United States, the only distributor, and operated as if it had exclusive rights and Living Color wanted a written agreement.  (Robinson Dep. 88; Ashford Dep. 112.) Living Color understood that the mark was branded in the United Kingdom, not the United States, and New Era expressed a desire for Living Color not to use their name in any company they sought to create. (Robinson Dep. 40; Ashford Dep. 56-57.)   Living Color believed they could use the mark but "out of respect" it would not use the mark if New Era did not agree.  (Robinson Dep. 89-90.)

The September 21, 2012 conference call was memorialized in an email from Rodney

Robinson, an employee of Living Color, to Dana Parham, owner of Living Color, which stated:

> The exclusive agreement . . . expired over 1 year ago.  The email agreement was only for a 2 year term and we have been pushing New Era for 3 years now.  Peter [Kersh of New Era] indicated that he would certainly entertain entering into another exclusive agreement, especially now that we are making such positive changes.

(Sept. 21, 2012 email from Rodney Robinson to Dana Parham.)

On December 16, 2013, Robinson and Parham of Living Color had a telephone

conference with Peter Kersh and Tom Noble of New Era to discuss strategy for their business

relationship. (Pl. Am. Statement ¶ 29.)  On December 17, 2013, Kersh sent an email to Parham

and Robinson at Living Color summarizing the conference call the day before and discussing

some of the issues.  Mr. Kersch stated, "It's not an easy situation on both sides given the

investments that have already been made but we always think of ways to try and go forward."

Mr. Kersh stated, "I have drafted out an agreement but won't send it to you until we have spoken

again." (Pl. Am. Statement ¶ 30.)  On December 19, 2013, Living Color responded to Mr.

Kersh's email of December 17, 2013, stating: "We have decided to 'stay the course' and continue

our current organic growth strategy and will be making some organizational changes to put

O'Rourke in greater control of the process." (Pl. Am. Statement ¶ 31.)

In late January of 2014, Tom Noble from New Era called Mark Vera at Aqua Tech to

inquire if Aqua Tech would be interested in distributing New Era products in the Midwest. (Pl.

Am. Statement ¶ 32.)  New Era was looking for another distributor because "they weren't seeing

the sales that they wanted to see in the U.S. markets and had a weakness in the Midwest." (Pl.

Am. Statement ¶ 33.)

New Era also contacted Ralph Cabbage of SICCE, S.P.A. in January of 2014, the same period of time that New Era contacted Aqua Tech.  (Pl. Am. Statement ¶ 35.)  Cabbage is a principal of SICCE, S.P.A., an Italian producer and distributor of pumps.  New Era reached out to Cabbage in January of 2014 to see if SICCE would be interested in distributing New Era products in the United States. (Pl. Am. Statement ¶ 36.)

Cabbage stated, "Tom [Noble of New Era] told me that New Era was not under obligation to Living Color and New Era thought the product could be sold better through someone else, and so they were looking for other people, and they had multiple people that they were talking to."  Cabbage testified, "But I had talked to them later on about, you know, are you sure that, this is an open deal, and it's okay with Living Color, and you're on top of that, and there's no contracts, things of that nature? And I was told yes, over and over again." (Pl. Am. Statement ¶ 37.)

Cabbage has testified:

New Era told me that they had trouble with - and I don't know the gentleman, the owner of Living Color, and I don't remember his name even when they said, if they did say. But they told me that Living Color has lots of other projects.  They didn't feel like that they had their full commitment to the project. They didn't feel like that they were stocking enough product, and they were running out of stock.
. . .

But the bottom line is, they didn't feel like Living Color had full energy behind the product, and they thought they had a huge opportunity and thus I could help with that opportunity.

(Pl. Am. Statement ¶ 38.)

Kersh and Noble from New Era visited the Aqua Tech facility in March of 2014 to discuss their interest in having Aqua Tech become a regional or national distributor for their

products.  During the visit, New Era informed Aqua Tech that Living Color was the current

importer and national distributor for New Era products.  New Era advised Aqua Tech that they

were not satisfied with the performance of Living Color, that sales were not on target, they felt

there was not adequate investment in their products, proper inventory levels were not maintained,

and that Living Color seemed distracted by other business it was doing.  New Era informed Aqua

Tech that it was looking to replace Living Color and was considering several options including

multiple regional distributors.[1] (Pl. Am. Statement ¶ 34.)

New Era told Aqua Tech it had a handshake deal with Living Color that had expired

about two years before and that Living Color was importing, but that it was a very rocky

relationship.  "New Era was not satisfied with what was going on and that Living Color had been

threatening to drop the line for over a year." (Pl. Am. Statement ¶ 41.)

New Era assured Aqua Tech that the break up between New Era and Living Color was

amicable. (Vera Dep. 164.)  Aqua Tech, however, was aware that New Era was having trouble

contacting Living Color's owner.  (Aqua Tech Dep. 183.)

In May of 2014, emails were exchanged between O'Rourke, New Era and Aqua Tech

about creating an exclusive distributorship for New Era products.  The emails discussed hiring

Leyden and O'Rourke and the new distribution relationship. (Emails, Ex. 15, DE 222-4.)

O'Rourke was employed with Living Color while he was engaging in these discussions to

replace Living Color with a different distributor for New Era and derived no compensation from

---

[1] New Era had also contacted a company called Red Sea North America, an American
affiliate of an Israeli owned company, to determine if Red Sea was interested in being a New Era
distributor because Red Sea distributed New Era products in the United States. (Pl. Am.
Statement ¶ 39.)

anyone other than Living Color. (Def. Resp. to Statement ¶ 26.)

In June of 2014, Aqua Tech knew that O'Rourke was employed with Living Color. (Aqua Tech Dep. 46, 75.)  New Era, Aqua Tech and O'Rourke coordinated the delivery of their first order from New Era to Aqua Tech, bypassing Living Color by communicating with O'Rourke through his personal email address. (O'Rourke Dep. 87-89, 132, 139-40, 144; Aqua Tech Dep. 91, 94, 115.)  Living Color's orders began to be sent directly to Aqua Tech. (O'Rourke Dep. 179-80.)   After continuing to take orders at Living Color that could not be filled, O'Rourke and Aqua Tech converted customers and started filling Living Color's orders for New Era products. (O'Rourke Dep. 156, 171-72.)  Aqua Tech knew O'Rouke was "treading a fine line." (O'Rourke Dep. 127-28; Aqua Tech Dep. 103.)  There was a plan to "discretely start moving customers." (Aqua Tech Dep. 109-11.)  According to O'Rourke, Aqau Tech requested O'Rourke send Living Color's customer lists, for which Aqua Tech thanked him.  (O'Rourke Dep. 154; Aqua Tech Dep. 121-22.)  Aqua Tech testified that it never encouraged O'Rourke to send lists of other information. (Aqua Tech Dep. 118.)  Aqua Tech would send emails to New Era, and O'Rourke would respond. (Aqua Tech Dep. 123.)

Neither O'Rourke nor New Era ever informed anyone at Aqua Tech that O'Rourke was bound by a non-compete agreement. (Pl. Am. Statement ¶ 46.)  Aqua Tech did not know anything more about O'Rourke and Leyden than that they were employees of Living Color, that New Era liked them and New Era wanted to keep them from being unemployed after the termination of its business relationship with Living Color. (Aqua Tech Dep. 106-07, 143.) By June of 2014, Aqua Tech knew that O'Rourke was employed by Living Color as the national sales manager for New Era products in the United States. (Aqua Tech Dep. 46-47.)  Aqua Tech

considered O'Rourke a liability and wanted nothing to do with him. (Pl. Am. Statement ¶ 48.)
Aqua Tech never requested information from anyone other than New Era. (Vera Dep. 123.)

Leyden was interviewed and ultimately hired by Aqua Tech in September of 2014. (Aqua
Tech Dep. 141-42, 147.)  Leyden had been looking for a different job since March 2014 because
things at Living Color had not been going as he had hoped and he knew that his job was going to
dissolve. (Pl. Am. Statement ¶ 53.)  Then, in early August of 2014, Leyden knew that New Era
was going to leave its business relationship with Living Color. (Pl. Am. Statement ¶ 54.)  Leyden
told Aqua Tech that he was leaving employment at Living Color because he was told by
O'Rourke that he would be losing his job at Living Color as a result of New Era terminating its
business relationship with Living Color. (Pl. Am. Statement ¶ 56.)  Leyden and O'Rourke
terminated their employment with Living Color in September of 2014. (Def. Resp. to Resp. 46.)

Aqua Tech entered into an exclusive distributor agreement with New Era on June 11,
2014 to become the exclusive distributor for New Era products in the United States effective July
1, 2014. (Pl. Am. Statement ¶ 49.)

On September 5, 2014, New Era sent an email to Parham and Robinson at Living Color
terminating the business relationship between New Era and Living Color.  The email stated, "The
relationship with Living Color is not working satisfactorily for us and, without wanting to go
over old stones, and to summarize in a few words, Living Color wants certain things and New
Era wants others. Consequently, sales development and the approach to the market are not going
as we need and that has brought us to this decision." (Pl. Am. Statement ¶ 57.)  Robinson
confirmed in a September 8, 2014 email that the "exclusive email agreement that existed with
New Era at one time - long ago - probably expired July/August 2011... We talked about a new

exclusive agreement over the past couple years but never entered into one." (September 8, 2014 email, Ex. 3, DE 215-1.)

Aqua Tech continues to sell New Era products. (Aqua Tech Dep. 153-54.)

Facts specific to Defendant O'Rourke and Leyden

On or around October 2012, O'Rourke became the sales manager for New Era products at Living Color. (Pl. Am. Statement ¶ 19.)  No one at Living Color knew more about the day-to-day workings of the business relationship between Living Color and New Era than O'Rourke.  (Pl. Am. Statement ¶ 27.)  Aqua-Tech was never informed that O'Rourke had entered into the Living Color employee non-disclosure agreement and O'Rourke never told Aqua-Tech that he was bound by such an agreement. (Pl. Am. Statement ¶ 28.)

Living Color told O'Rourke that the New Era brand sales were going to be shut down due to lack of profit and that Living color felt its relationship with New Era was very one-sided and that Living Color was not treated well as a distributor. (O'Rourke Dep. 46, 66.)  Robinson would advise O'Rourke that to keep Living Color's owner interested in selling New Era, he needed to keep the cash flow positive. (Robinson Dep. 67.)  Robinson did this to motivate O'Rourke because the owner was "headstrong" on continuing the relationship. (Robinson Dep. 68.)

Every month, Living Color delivered a sales report to New Era that identified every customer that Living Color sold New Era brand marine animal products, broken down by customer, category and market segment. (O'Rourke Aff. ¶ 12; Ashford Dep. 103-104; Robinson Dep. 84.)   Living Color created a customer list that included customers for its marine animal food business and its overall marine animal life business. (Ashford Decl. ¶ 13, DE 222-1.)

Living Color's customer list took considerable time, effort, knowledge and expense to

create and develop. The customer list includes not just actual customers for Living Color's marine animal food business but also its customers for its overall marine animal life business. Living Color has firm policies in employee handbooks and non-disclosure agreements restricting dissemination of its customer lists. (Ashford Decl. ¶ 13.) There was no non-disclosure agreement between Living Color and New Era. (Ashford Dep. 71-72; Robinson Dep. 82.)

New Era asked O'Rourke to provide Aqua-Tech information regarding products New Era sold Living Color and that Living Color sold, including quantity, price and profit. (O'Rourke Dep. 154, 173-74.) New Era asked O'Rourke to send Aqua-Tech Living Color's customer list for New Era food. (O'Rourke Dep. 158.) New Era provided Aqua Tech with "sales numbers and customers lists" and "references with regard to public aquariums" and Aqua-Tech contacted certain customers to verify the quantities of products that they were buying as part of Aqua Tech's due diligence. (Pl. Am. Statement ¶ 43.) Aqua Tech reviewed customer lists, financial statements and other financial date supplied to him by New Era to perform due diligence on the New Era business. (Pl. Am. Statement ¶ 44.) Aqua Tech did not ask O'Rourke for lists and did not encourage him to provide any information. (Vera Dep. 118.)

When New Era emailed O'Rourke and told him it was thinking about changing distributors, O'Rourke stated he was not comfortable hearing about that since he was employed by Living Color. New Era told him that he would still have a job if he wanted it. (O'Rourke Dep. 74-76.) New Era requested O'Rourke to communicate via his personal email account, not his Living Color account. (Def. Resp. to Statement ¶ 22.) As of May 4, 2014, O'Rourke was aware that New Era intended to terminate the Living Color distributorship. (O'Rourke Dep. 103.)

A June 18, 2014 email discussed the initial shipping invoice between New Era and Aqua

Tech.  It was generated by New Era, who sent it to O'Rourke as well. (June 18, 2014 email, Ex. 19, DE 222-4.)  New Era also told O'Rourke not to place any orders with New Era from Living Color. (O'Rourke Dep. 95.)  At New Era instructions, O'Rourke sent Living Color's orders directly to Aqua Tech for fulfillment. (O'Rourke Dep. 179-80.)

New Era created a punch list of items to convert from Living Color which directed O'Rourke to transfer and save all New Era customer contact details to a USB drive, send transition emails to Living Color's customers, and meet with sub-distributors regarding the changeover. (Def. Resp. to Statement ¶ 33.)  O'Rourke transferred customer contact details from Living Color's computer system to a USB drive. (O'Rourke Dep. 164-65.)  New Era knew this same information. (O'Rourke Dep. 158, 173.)  Leyden provided his Living Color customer contact information to O'Rourke just days after he and O'Rourke resigned from Living Color and subsequent to finalizing his employment relationship with Aqua Tech. (Def. Resp. to Statement ¶ 42.)  Aqua Tech co-authored an email for O'Rourke to send to all of Living Color's customers announcing a change in distributorship from Living Color to Aqua Tech. (Def. Resp. to Statement ¶ 44.)

O'Rourke sent Aqua Tech an August 7, 2016 email which put them in touch with Leyden who would be a "great addition" to the sales team. (Leyden 000006, Ex. 26 to Vera Dep.)  Leyden does not remember when he had contact with Aqua Tech for the first time, but he was looking for work starting in March 2014.  (Leyden Dep. 58-59, 161.)   Aqua Tech did email Leyden in order to hire him. (Def. Resp. to Statement ¶ 39.)  O'Rourke testified that New Era and Aqua Tech had each reached out to Leyden. (O'Rourke 111-12.)  Leyden was aware at this time that New Era was going to sever the business relationship with Living Color and was also aware

that O'Rourke would be passing along Leyden's contact information to Aqua Tech as the new distributor for New Era. (Def. Resp. to Statement ¶ 40.)  On September 5, 2014, Leyden added Aqua Tech as administrator on the New Era Facebook page, even no one asked him to do it. (Leyden Dep. 30, 55, 75.)  Leyden testified until he saw the August 7, 2016 email, he had not spoken to Aqua Tech. (Leyden Dep. 49.)

 Until those terminations, Living Color did not know anything was out of the ordinary. (Ashford Decl. ¶ 17.)  When O'Rourke went to work for New Era, he received a telephone, laptop, Ipad and $500.00. (Def. Resp. to Statement ¶ 48.) Leyden finalized his employment relationship with Aqua Tech on September 8, 2014 and began working at Aqua Tech shortly thereafter. (Def. Resp. to Statement ¶ 49.)

During the course of this litigation, Living Color discovered that New Era declared insolvency in the United Kingdom but was continuing its business under a new entity World Feeds, Ltd..  (Ashford Decl. ¶¶ 20-21.)

Living Color has attempted to mitigate its losses by distributing another marine animal food product. (Ashford Decl. ¶ 19.)  Living Color's expert estimates damages totaling $1,134,000.00. (Thomas Santoro Decl. ¶ 6, DE 222-12.)

Defendants Aqua Tech and Leyden move for summary judgment on each count against them. Living Color moves for summary judgment on all counts in the Second Amended Complaint.

II.  Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant  is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477

U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not

suffice; there must be enough of a showing that the jury could reasonably find for that party."

Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-

moving party "is merely colorable, or is not significantly probative, then summary judgment may

be granted."  Anderson, 477 U.S. 242, 249-50.

III. Discussion

Count II - Trademark Infringement

Defendants Aqua Tech and Leyden move for summary judgment on these counts on the

basis that Living Color did not own or have any vested rights in the trademark that Living Color

alleges Defendants infringed.  In response, Living Color claims an express agreement or implied

agreement existed between Living Color and New Era that Living Color would own the United

States rights in the mark.  Alternatively, Living Color contends it was granted a naked license for

the Mark.  Living Color seek summary judgment against all Defendants, claiming all Defendants

infringed Living Color's rights in the mark.

Absent a specific agreement to the contrary, a distributor does not acquire any rights to a

manufacturer's trademark.  Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc., 934

F.2d 1551, 1563 (11th Cir. 1991).  As between a foreign manufacturer and an exclusive United

States distributor, courts have held that the foreign manufacturer is presumed to be the owner of

the mark absent some other agreement.  Ilapak Research & Development S.A. v. Record SpA.,

762 F. Supp. 1318, 1322 (N.D. Ill. 1991); see also Energy Jet, Inc. v. Forex Corp., 589 F. Supp.

1110, 1116 (E.D. Mich. 1984) (presumption mark belongs to manufacturer). The parties agree

that this presumption may be overcome by looking to the following factors: who created the

mark, which party first affixed the mark to goods sold, which party's name appeared on the packaging, which party exercised control over the nature and quality of good on which the mark appeared, which party did customers associate with the mark and which party paid for advertising and promotion. (DE 219 at 10; DE 237 at 8.)

To demonstrate an express agreement, Living Color points to the following testimony of Todd Ashford who stated that, in discussing the business relationship with New Era, Living Color was tasked with developing the brand and marketing in the United States. (Ashford Dep. 77-81.) At the same time, however, when asked whether New Era agreed that Living Color owned the trademark, Ashford stated, "No. Again, there's no written communication that specifically detailed that specific thing." (Ashford Dep. 80.) The Court finds that this testimony is inadequate to demonstrate an express agreement.

In support of its claim of an implied agreement, Living Color states it was not aware that New Era obtained two trademark registrations from the USPTO, in August of 2009 and May of 2012 and it believed New Era had a trademark in the United Kingdom, not the United States. Moreover,  Living Color also claims New Era "encouraged" it to develop their brand and a market in the United States.

 The registration process is public notice of a claim to ownership in the marks and therefore Living Color's lack of actual knowledge does not create an implied agreement. Humanoids Group v. Rogan, 375 F.3d 301, 304-05 n.3 (4th Cir. 2004) (citing Allard Enters., Inc. v. Advanced Programming Res., Inc., 249 F.3d 564, 572 (6th Cir. 2001) and Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1395 (3d Cir.1985)).   Nor does "encouragement" by New Era create an implied agreement.

With respect to rebutting the presumption that New Era owned the mark, the Court will go through the various factors.   Notably, the parties both agree that New Era created the mark. Aqua Tech and Living Color dispute who designed the logo.  Living Color would remove the food from the bulk containers, put it in smaller containers, put the label on and secure the top. New Era's name was on the packaging and promotional materials.  Living Color does not dispute that New Era exclusively controlled the nature and quality of the goods.  With respect to whether the customers say they saw the product as a New Era or Living Color product, there was minimal evidence of customer confusion.  The parties agree that both New Era and Living Color paid for advertising and promotion of the New Era products.  Basically, the only factor in Living Color's favor is that there may have been slight customer confusion.  Such paltry evidence does not rebut the presumption that the New Era owned the mark.

Finally, Living Color contends that New Era granted a naked license to it.  Living Color claims that, in determining whether there has been a naked license, "the only consideration for the Court is whether New Era exercised any quality control over the Mark." (DE 237 at 6.)  The Eleventh Circuit has stated that to establish "naked licensing" through abandonment, it must prove an intent to abandon on the part of the trademark owner.  See Babbit Electronics, Inc. v. Dynascan Corp., 38 F.3d 1161, 1180 (11th Cir. 1994).  Living Color points to its control over the New Era product, including repackaging the product into smaller containers, building a temperature controlled facility and complying with the Food and Drug Administration ("FDA") requirements for food.  The Court finds this evidence does not raise a question of fact on the issue of abandonment.  See TracFone Wireless, Inc. v. Clear Choice Connections, Inc., 102 F. Supp. 3d 1321, 1327 (S.D. Fla. 2015) ("because a finding of abandonment works an involuntary

forfeiture of rights, federal courts uniformly agree that [those] asserting an abandonment defense face a stringent, heavy or strict burden of proof.")

The Court grants summary judgment on the federal trademark infringement claim to Aqua Tech and Leyden and denies Living Color's motion for summary judgment on this count.[2]

<u>Count III - Unfair Competition</u>[3]

Living Color moves for summary judgment on this count, contending that Defendants engaged in unfair competition when New Era and Aqua Tech "perpetrated a four-month scheme designed to misappropriate Living Color's customers and employees and put it out of business in the marine animal food industry." (Pl. Mot. at 11.)

"A claim of unfair competition in Florida rises under the common law and, while elusive of precise definition, requires a plaintiff to prove, at minimum, competition and unfairness." <u>Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.</u>, 444 F.3d 1356, 1362 (Fed. Cir. 2006) (citing <u>Practice Mgmt. Assoc., Inc. v. Old Dominion Ins. Co.</u>, 601 So.2d 587, 587–88 (Fla. Dist. Ct. App. 1992)).

The Court finds there are questions of fact that prevent the entry of summary judgment for Living Color.  While there is certainly record evidence that New Era, Aqua Tech and O'Rourke colluded together to cause the changeover of Living Color to Aqua Tech as distributor

---

[2] For the same reasons, the Court denies Living Color's motion for default judgment against New Era for declaratory judgment and trademark infringement on the basis that Living Color owns the mark.

[3] The Court rejects Aqua Tech's argument that the trademark analysis applies to count III, the common law unfair competition claim. This claim concerns the alleged misappropriation of the business and not trademark infringement.  Therefore, Aqua Tech's motion for summary judgment on this count is denied.

for New Era, there is also record evidence that raises a genuine issue of material fact as to whether Aqua Tech engaged in unfair business practices. During the time period when Living Color claims unfair business practices, Living Color had already lost its exclusive right to distribute New Era products and New Era told potential new distributors that it no longer had any contractual obligation to Living Color. Subsequently, in June of 2014, Aqua Tech entered into a written agreement with New Era to be the exclusive distributor of New Era fish food products. Leyden was not introduced to Aqua Tech until, at the earliest, August 7, 2014, which was after New Era and Aqua Tech entered into a business relationship. Therefore, Leyden could not have engaged in any scheme orchestrated by New Era and Aqua Tech to interfere with Living Color's business.

Additionally, there is record evidence that it was New Era, not Aqua Tech, that encouraged O'Rourke to provide information to Aqua Tech and that Aqua Tech communicated with New Era, not O'Rourke, about the changeover in distributorship. There is also record evidence that shows that New Era had, on its own, made the decision to leave Living Color and seek out another distributor. With respect to New Era, however, there is undisputed evidence that New Era engaged O'Rourke to supply it with Living Color's business information to divest Living Color of its marine food business.

For these reasons, the Court denies Living Color's motion for summary judgment against Aqua Tech, Leyden and O'Rourke, denies Aqua Tech motion for summary judgment, grants Leyden's motion for summary judgment and grants Living Color's motion for summary judgment against New Era and World Feeds.[4]

---

[4] Summary judgment against World Feeds is based on successor liability. See infra.

<u>Count IV -Breach of Non-Compete against O'Rourke</u>

Living Color moves for summary judgment against O'Rourke for breach of his non-compete agreement.  That agreement prohibited O'Rourke from disclosing any of Living Color's trade secrets or customer information. The record evidence shows that O'Rourke solicited Living Color's customers and Leyden for Aqua Tech's benefit and provided customer information to Aqua Tech.  The Court rejects O'Rourke's argument that because he did not reach out to New Era, he did not violate the agreement.  Simply by providing the confidential information, regardless of whether or not he initiated the contacts, constitutes a violation the agreement.

For these reasons, the Court grants summary judgment on count four to Living Color.

<u>Counts V and VI - Breach of Fiduciary Duty against O'Rourke and Leyden</u>

A plaintiff bringing a breach of fiduciary duty cause of action must prove: the existence of a fiduciary duty, a breach of that duty and damages proximately caused by the breach.  <u>Silver v. Countrywide Home Loans, Inc.</u>, 760 F. Supp. 2d 1330, 1338 (S.D. Fla. 2011), <u>aff'd</u>, 2012 WL 2052949 (11th Cir. 2012); <u>Crusselle v. Mong</u>, 59 So. 3d 1178, 1181 (Fla. Dist. Ct. App.  2011).

A.  O'Rourke

Living Color moves for summary judgment on this count against O'Rourke by claiming he: (1) held a high-ranking position an authority with Living Color; (2) coordinated the misappropriation of Living Color's business while still employed by Living Color; (3) coordinated the selection of Aqua Tech while still employed by Living Color; (4) competed with Living Color; (5) disclosed Living Color's trade secrets and (6) derived an improper benefit from these actions.  O'Rourke does not challenge these assertions and the Court finds that the record supports a finding, as a matter of law, that O'Rourke breached his fiduciary duties to Living

21

Color.

### B.  Leyden

Here, there is no evidence that Leyden communicated with Aqua Tech before August 7, 2014 and New Era entered into its relationship with Aqua Tech in June of 2014.   As for any communication by Leyden after his resignation from Living Color, Leyden was not covered by a non-solicitation agreement and was therefore free to compete against Living Color once he resigned.  See Harllee v. Professional Service Industries, Inc., 619 So. 2d 298, 300 (Fla. Dist. Ct App. 1992).

Thus, the Court grants Leyden's motion for summary judgment, denies Living Color's motion for summary judgment against Leyden and grants Living Color's motion for summary judgment against O'Rourke.

### Counts VII and VIII - Aiding and Abetting Breach of Fiduciary Duty against New Era and Aqua Tech

A claim for aiding and abetting a breach of fiduciary duty requires: (1) a fiduciary duty on the part of the primary wrongdoer; (2) a breach of this fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing. Bruhl v. Price Waterhousecoppers Intern., 03–23044–CIV, 2007 WL 983263, at * 10 (S.D. Fla. Mar.27, 2007). To satisfy the substantial assistance element, a plaintiff must allege (1) recklessness and a duty to disclose the breach or (2) conscious intent. Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Group, Ltd., 05–60080–CIV, 2011 WL 1233106, at * 9 (S.D. Fla. Mar. 30, 2011).

### A.  New Era

Living Color moves for summary judgment on the basis that New Era made O'Rourke

and Leyden part of their scheme to misappropriate Living Color's business while they were both still employed by Living Color and New Era intended to cause the fiduciary breaches by O'Rourke and Leyden. New Era worked closely with O'Rourke when changing distributors, and instructed O'Rouke to communicate with it through his personal, not work email. New Era directed O'Rourke to take several actions to harm Living Color, including providing customer lists and financial information to Aqua Tech and meeting with sub-distributors regarding the changeover from Living Color to Aqua Tech.

Based on this undisputed record evidence, the Court grants Living Color's summary judgment against New Era on its claim for aiding and abetting a breach of fiduciary duty by O'Rourke, but not by Leyden.

### B. Aqua Tech

Both Living Color and Aqua Tech move for summary judgment on this count. Given that the Court has found that Leyden did not breach a fiduciary duty, the Court grants summary judgment in favor of Aqua Tech as to aiding and abetting pertaining to Leyden. With respect to O'Rourke, the Court finds there are genuine issues of material fact which preclude summary judgment.

On one hand, Aqua Tech knew that O'Rourke was still employed by Living Color when it received customer lists and sales information from New Era and O'Rourke. Aqua Tech also co-authored an email with O'Rourke to Living Color's customers announcing the change in distributorship. On the other hand, Aqua Tech did not know O'Rourke had an employment contract with a covenant not to compete and claims it never requested any information from anyone other than New Era. For these reasons, the Court cannot determine, as a matter of law,

whether or not Aqua Tech aided and abetted a breach of fiduciary duty by O'Rourke.

Counts IX, X, XI, XII - Tortious Interference with a Business Relationship against Aqua Tech, New Era, O'Rourke and Leyden

The elements for tortious interference with a business relationship are: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant and (4) damage to the plaintiff as a result of the interference." Rosenbaum v. Becker & Poliakoff, P.A., No. 08–81004–CIV, 2010 WL 376309, at * 4 (S.D. Fla. Jan. 26, 2010); Palm Beach County Health Care Dist. v. Professional Med. Educ., Inc., 13 So. 3d 1090, 1094 (Fla. Dist. Ct. App. 2009); Salit v. Ruden, McClosky, Smith, Schuster, Russell, P.A., 742 So. 2d 381, 385 (Fla. Dist. Ct. App. 1999).

With respect to New Era, the undisputed record evidence shows that New Era was aware of the business relationship between Living Color and O'Rourke and that New Era sought to interfere with Living Color's relationships with its employees and customers, causing Living Color to lose its marine animal food business.

With respect to Aqua Tech, there is a question of fact as to whether Aqua Tech tortiously interfered with Living Color's business relationships.[5] Specifically, there are genuine issues of material fact as to whether Aqua Tech intentionally interfered with the business relationship of Living Color and New Era and whether Aqua Tech caused Living Color any damage. On one hand, there is evidence that New Era, not Aqua Tech, led the charge to deprive Living Color of business and Aqua Tech was merely engaging in lawful competition. On the other hand, there is

---

[5] Aqua Tech concedes elements one and two of this claim.

24

evidence that Aqua Tech was part of the collusion to cause the changeover of Living Color to Aqua Tech as distributor for New Era.

Next, with respect to O'Rourke, there is evidence that he worked with New Era to facilitate the change from Living Color to Aqua Tech.  There is also evidence that O'Rourke told New Era that he was not comfortable hearing about their plans to change distributors because he was still working at Living Color.

Lastly, Leyden was not introduced to Aqua Tech until after New Era and Aqua Tech entered into a business relationship and therefore cannot have engaged in tortious interference.

Summary judgment is granted in favor of Living Color with respect to New Era and denied with respect to Aqua Tech, O'Rourke and Leyden.  Leyden's motion for summary judgment on this count is granted.

<u>Count XIII, XIV, XV and XVI - Misappropriation of Trade Secrets against New Era, Aqua Tech, O'Rourke and Leyden</u>

To prevail on a claim for misappropriation of trade secrets under Florida law, a plaintiff must allege that "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it."  <u>Del Monte Fresh Produce Co. v. Dole Food Co., Inc.</u>, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001).  "Under Florida law, a trade secret consists of information that (1) derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy."  <u>Am. Red Cross v. Palm Beach Blood Bank, Inc.</u>, 143 F.3d 1407, 1410 (11th Cir. 1998).

The Court finds there is a question of fact on this issue because it is unclear from the

record whether the information Living Color claims are trade secrets were freely shared with New Era.  If the information was freely shared, this claim cannot succeed.  With respect to Leyden, however, there is no evidence that he provided any information to Aqua Tech and summary judgment is granted in his favor.

As such, summary judgment is granted as to Leyden in his favor but denied as to the other Defendants.

Count XVII- Successor Liability against World Feeds

Living Color moves for summary judgment, providing evidence that World Feeds is a mere continuation of New Era and should be liable for any judgment against New Era.  See Centimark Corp. v. A to Z Coatings & Sons, Inc., 288 F. App'x 610, 614 (11th Cir. 2008) (discussing successor liability).  There is no evidence in the record disputing World Feeds' successor liability and the Court will grant summary judgment in favor of Living Color on this count.

Count XVIII - Misappropriation of Trade Secrets by World Feeds

Living Color seeks summary judgment against World Feeds because it obtained customer lists from New Era.  Because the Court cannot determine, as a matter of law, whether the information at issue are trade secrets, summary judgment is denied.

Count XIX- False Designation of Origin against World Feeds

Living Color moves for summary judgment against this entity "related to its advertising of the 'rebranding' of the mark." (Pl. Mot. at 36.)  Given that this claim rests upon the premise that Living Color owns the mark, the Court denies Living Color summary judgment on this count.

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1)      Living Color's Motion for Entry of Default and Partial Default Judgment against

New Era (DE 137) is **GRANTED IN PART AND DENIED IN PART**.  Entry of

default is appropriate on the basis that New Era has failed to respond to the

second amended complaint.  Default judgment is not appropriate on the

declaratory judgment and trademark infringement claim against New Era.

2)      Defendants Aqua-Tech Co.'s Motion for Summary Judgment (DE 219) is

**GRANTED IN PART AND DENIED IN PART**.

3)      Defendant Aqua Tech's Motion to Take Judicial Notice (DE 211) and Amended

Motion to Take Judicial Notice (DE 214) are **DENIED AS MOOT**.

4)      Plaintiff Living Color Enterprises Inc.'s Motion for Summary Judgment (DE 223)

is **GRANTED IN PART AND DENIED IN PART**.

5)      Daniel Leyden's Motion for Summary Judgment (DE 224) is **GRANTED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 9th day of September, 2016.

KENNETH A. MARRA
United States District Judge

27